STANLEY FRIEDLER, M.D.                    *
4000 Old Court Road
Pikesville, Maryland 21208               *        IN THE

and                                       *        CIRCUIT COURT FOR

SG PADONIA, LLC                           *        BALTIMORE COUNTY
4000 Old Court Road
Pikesville, Maryland 21208               *        Case No.:

and                                       *

SELVIN PASSEN, M.D.                       *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                *

and                                       *        CCB 04 CV 1983

LIGHTHOUSE POINT FAMILY, LLC             *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                *

and                                       *

PADONIA TOWER ASSOCIATES, LLP            *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                *

and                                       *

THREE CENTRE PARK, LLC                    *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                *

and                                       *

200 WASHINGTON AVENUE, LLC               *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                *

and                                       *

GEMINI REALTY, LLC                        *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                *

and                                       *

RIDERWOOD, LLC                            *

198055.06

2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                    *

and                                         *

6325 WOODSIDE, LLC                          *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                    *

and                                         *

PADONIA WEST, LLC                           *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                    *

                                            *
and                                         
                                            *

SLIP & SHORE, LLC                           *
2700 Lighthouse Point East, #626
Baltimore, Maryland 21224                    *

            Plaintiffs,                      *

v.                                          *

HENRY L. COLE, JR.                          *
901 Green Spring Valley Road
Baltimore, Maryland 21093                    *

and                                         *

                                            *

B&N REALTY INCORPORATED                     *
22 W. Padonia Road
Timonium, Maryland 21093                     *

                                            *
        Serve on:
        HENRY L. COLE, JR., President        *
        22 W. Padonia Road
        Timonium, Maryland 21093             *

and                                         *

PADONIA MANAGEMENT, LLC                     *
22 W. Padonia Road
Timonium, Maryland 21093                     *

Serve on:                                                    *
HENRY L. COLE, JR., Resident Agent
22 W. Padonia Road                                           *
Timonium, Maryland 21093
                                                             *

and                                                          *

                                                             *

PATRICIA BART                                                *
22 W. Padonia Road
Timonium, Maryland 21093                                     *

and                                                          *

                                                             *

NRT MID-ATLANTIC TITLE SERVICES, LLC                         *
t/a Coldwell Banker Title Services
11350 McCormick Road, Suite 200                              *
Hunt Valley, Maryland 21031
                                                             *

    Serve on:                                                *
    Resident Agent
    CSC Lawyers Incorporating Services                       *
    11 E. Chase St.
    Baltimore, Maryland 21202                                *

and                                                          *

                                                             *

NRT MID-ATLANTIC, INC.                                       *
t/a O'CONOR, PIPER & FLYNN ERA
and Coldwell Banker Commercial NRT                           *
11350 McCormick Road, Suite 200
Hunt Valley, Maryland 21031                                  *

    Serve on:                                                *
    Resident Agent
    CSC Lawyers Incorporating Services                       *
    11 E. Chase St.
    Baltimore, Maryland 21202                                *

and                                                          *

                                                             *

DAVID I. MILLER, M.D.                                        *
2106 Carterdale Road
Baltimore, Maryland 21209                                    *

and                                                          *

DLS EXCHANGE CORPORATION                                     *
250 W. Pratt Street
Baltimore Maryland  21201

    \*

    **Serve on:**
    **Resident Agent**    \*
    **Anilkumar Hoffberg, Esq.**
    **250 W. Pratt Street**    \*
    **Baltimore, Maryland 21201**

    \*

**and**    \*

**CORRIDOR RF&S REAL ESTATE, LLC**    \*
**Suite 2100**
**Baltimore, Maryland 21201**    \*

    **Serve on:**    \*
    **Gerald M. Katz, Resident Agent**
    **Suite 400**    \*
    **901 Dulany Valley Road**
    **Baltimore, Maryland 21204**    \*

**and**    \*

**200 L.P., INCORPORATED**    \*
**111 Water Street**
**Baltimore, Maryland 21202**    \*

    **Serve on:**    \*
    **Michael B. Glick, Resident Agent**
    **111 Water Street**    \*
    **Baltimore, Maryland 21202**

    \*

**and**    \*

**H-200 LIMITED PARTNERSHIP**    \*
**10220 South Dolfield Road**
**Owings Mills, Maryland 21117**    \*

    **Serve on:**    \*
    **Helmsman Property Services, Inc.**
    **Resident Agent**    \*
    **10220 South Dolfield Road**
    **Owings Mills, Maryland 21117**    \*

**and**    \*

**VI-4 LIMITED PARTNERSHIP**    \*
**10220 South Dolfield Road**
**Owings Mills, Maryland 21117**    \*

    **Serve on:**    \*
    **Michael Glick, Resident Agent**
    **10220 South Dolfield Road**    \*
    **Owings Mills, Maryland 21117**

           \*

**and**             \*

**OLD PAD LLC**      \*
**22 W. Padonia Road, Suite 100**
**Timonium, Maryland 21093**  \*

      **Serve on:**    \*
      **Robert M. Ercole, Resident Agent**
      **One South Street, 27th Floor**  \*
      **Baltimore, Maryland 21202**
                  \*

**and**             \*

**OLD PAD II, LLC**     \*
**22 W. Padonia Road, Suite 100**
**Timonium, Maryland 21093**  \*

      **Serve on:**    \*
      **Robert M. Ercole, Resident Agent**
      **One South Street, 27th Floor**  \*
      **Baltimore, Maryland 21202**

      **Defendants.**    \*

                  \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT

Plaintiffs Stanley Friedler, M.D. ("Friedler"), SG Padonia, LLC ("SG Padonia"), Selvin Passen, M.D. ("Passen"), Lighthouse Point Family, LLC ("Lighthouse Point"), Padonia Tower Associates, LLP ("Padonia Tower"), Three Centre Park, LLC ("TCP"), 200 Washington Avenue, LLC ("200 Washington Avenue"), Gemini Realty, LLC ("Gemini"), Riderwood, LLC ("Riderwood"), 6325 Woodside, LLC ("Woodside"), Padonia West, LLC ("Padonia West") and Slip & Shore, LLC ("Slip & Shore") hereby sue Defendants Henry L. Cole, Jr. ("Cole"), B&N Realty Incorporated ("B&N"), Padonia Management, LLP ("Padonia Management"), Patricia Bart ("Bart"), NRT Mid-Atlantic, Inc. t/a O'Connor, Piper & Flynn ERA and Coldwell Banker Commercial NRT, NRT Mid-Atlantic Title Services, LLC, t/a Coldwell Banker Title Services, David Miller ("Miller"), DLS Exchange Corporation ("DLS Exchange"), Corridor RF&S Real Estate, LLC ("Corridor"), H-200 Limited Partnership ("H-200"), 200 L.P., Incorporated ("200

L.P."), VI-4 Limited Partnership ("VI-4"), Old Pad LLC ("Old Pad") and Old Pad II, LLC ("Old Pad II"), for the following reasons:

## THE PARTIES

1.      Plaintiff Friedler is an individual residing in the State of Maryland.

2.      Plaintiff SG Padonia is a Maryland limited liability corporation.

3.      Plaintiff Passen is an individual residing in the State of Florida.

4.      Plaintiff Lighthouse Point is a Maryland limited liability corporation.  Passen is the managing member of Lighthouse Point.

5.      Plaintiff Padonia Tower is a Maryland limited liability partnership.

6.      Plaintiff TCP is a Maryland limited liability corporation.

7.      Plaintiff 200 Washington Avenue is a Maryland limited liability corporation.

8.      Plaintiff Gemini Realty is a Nevada limited liability corporation.  Passen is the managing member of Gemini Realty.

9.      Plaintiff Riderwood is a Maryland limited liability corporation.

10.      Plaintiff Woodside is a Maryland limited liability corporation.

11.      Plaintiff Padonia West is a Maryland limited liability corporation.

12.      Plaintiff Slip & Shore is a Maryland limited liability corporation.

13.      Defendant Cole is an individual residing in the State of Maryland.  Cole is licensed by the State of Maryland as a commercial real estate broker.

14.      Defendant B&N is an unincorporated entity, on information and belief, located in the State of Maryland.

15.      Defendant Padonia Management is a Maryland limited liability corporation. Padonia Management is in the business of managing commercial real estate buildings in the Baltimore metropolitan area.

16.      Defendant NRT Mid-Atlantic, Inc. is a Maryland corporation.  NRT Mid-Atlantic, Inc. does business under the trade names O'Conor, Piper & Flynn ERA ("OPF") and Coldwell Banker Commercial NRT.  On information and belief, NRT Mid-Atlantic, Inc. acquired all of

OPF's liabilities and obligations, including those set forth in this Complaint. Hereafter, unless otherwise indicated, NRT Mid-Atlantic, Inc. and OPF are referred to collectively as "Coldwell Banker Commercial." Coldwell Banker Commercial is the principal and/or employer of Cole, one of its real estate agents who transacted real estate business with Friedler and Passen.

17. Defendant NRT Mid-Atlantic Title Services, LLC is a Maryland limited liability corporation that does business under the trade name Coldwell Banker Mid-Atlantic Title Services ("Coldwell Banker Title"). Coldwell Banker Title is in the business of providing title insurance and settlement and escrow services for commercial real estate closings. On information and belief, Coldwell Banker Title handles many of Coldwell Banker Commercial's title needs and settlement and closing services.

18. Defendant Bart is an individual residing in the State of Maryland. At all times relevant to this Complaint, Bart was employed by Coldwell Banker Commercial.

19. Defendant Miller is an individual living in Baltimore County.

20. DLS Exchange is a Maryland corporation. On information and belief, DLS Exchange holds the proceeds from the sale of an office building for purposes of executing a tax-free exchange.

21. Defendant Corridor is a Maryland limited liability corporation licensed by the State of Maryland as a real estate broker.

22. Defendant H-200 is a Maryland limited liability partnership.

23. Defendant 200 L.P. is a Maryland limited liability partnership.

24. Defendant VI-4 is a Maryland limited liability partnership.

25. Defendant Old Pad is a Maryland limited liability corporation.

26. Defendant Old Pad II is a Maryland limited liability corporation.

## JURISDICTION & VENUE

27. This Court has subject matter jurisdiction over this matter pursuant to Md. Cts. & Jud. Proc. Code Ann. §1-501 and personal jurisdiction pursuant to Md. Cts. & Jud. Proc. Code Ann. §6-102(a).

28.    Venue is proper pursuant to Md. Cts. & Jud. Proc. Code Ann. §6-201(1998).

## FACTS COMMON TO ALL COUNTS

29.    Cole is one of Coldwell Banker Commercial's top producing commercial real estate brokers who Coldwell Banker Commercial knows has a "penchant for investing" in commercial real estate.  At all times relevant to this claim, Cole acted on behalf of Coldwell Banker Commercial and in his capacity as one of Coldwell Banker Commercial's real estate agents.

30.    Since at least as early as 2000, Cole has engaged in a pattern of racketeering activities, conducted through various enterprises, the purpose of which was to defraud investors through a series of fraudulent real estate investments.

31.    Cole was the leader and director of this illegal scheme who used his influence and his position as one of Coldwell Banker Commercial's top producing commercial real estate brokers to defraud Plaintiffs Friedler and Passen and the entities in which they held their interests out of their investments in various real estate holdings in the Baltimore metropolitan area. Friedler and Passen held these investments in the various entities that are named as Plaintiffs, of which they are the managing members.

32.    As set forth more fully below, each of the Defendants played a role, or otherwise conducted or participated in the conduct of the enterprise's affairs and/or fraudulent conduct perpetrated against Plaintiffs.

33.    One method by which Coldwell Banker Commercial and Coldwell Banker Title profited from Cole's investments was through Coldwell Banker Title acting as the exclusive settlement and escrow agent for all of Cole's deals.  Coldwell Banker Title also sold title insurance for each property, earning a commission on each sale.  Coldwell Banker Commercial was also paid other commissions and other unearned and unauthorized fees for all real estate deals in which Cole participated as an investor.

34.    In early 2000, Miller who was both professionally and personally acquainted with Friedler, introduced Friedler to Cole.

35.    Cole represented to Friedler that Cole's position with Coldwell Banker Commercial gave Cole the ability to identify and acquire office properties that represented good investment opportunities.  Because Cole had previously filed for bankruptcy, however, Cole stated that he could not personally guarantee the financing necessary to acquire those properties.

36.    Cole proposed to Friedler that Friedler enter into real estate investments with Cole and Miller in which Cole would locate office properties, often before they were listed for sale, negotiate favorable sales contracts and, after the properties were acquired, Cole would manage the properties through Padonia Management, a real estate management company controlled by Cole, in which Friedler and Miller would also be equal members.

37.    Cole represented to Friedler that Cole's position and experience with Coldwell Banker Commercial gave him a unique insight into the workings of the commercial real estate market in the Baltimore metropolitan area.  Cole represented to Friedler that Coldwell Banker Commercial was aware of Cole's private investment activities and that Coldwell Banker Commercial not only approved of it, but also was willing to assist Cole in consummating the transactions.

38.    Cole represented that if Friedler and Miller provided guarantees to lending institutions to secure acquisition financing (something Cole could not do), and provided other capital outlays, Cole would locate, negotiate contracts of sale, and acquire the properties on their behalf.

39.    In order to induce Friedler into this business arrangement, Cole represented to Friedler that he would not receive any real estate commission or other payments on any transaction with which Friedler was associated.  Cole also agreed to be responsible for the day-to-day management of the properties without receiving a management fee.  Cole represented to Friedler that, for all major management decisions affecting the properties, he would consult and require approval from all of the members before taking any action.

40.    In all other respects, Cole represented to Friedler that Cole, Friedler and Miller would be equal partners, each responsible for all capital obligations to acquire and manage the

properties. In return, Cole proposed that he, Friedler and Miller would share equally, one-third each, in the corporate entities created to hold ownership of the properties.

41.    Cole represented to Friedler that this arrangement would be extremely beneficial to Friedler because, under his arrangements with Coldwell Banker Commercial, Cole was entitled to receive eighty percent of any commission earned on properties where Coldwell Banker Commercial was the listing agent or was otherwise involved as an agent. Cole explained that sellers typically pass through commissions to purchasers as part of the purchase price for the properties.

42.    Cole represented to Friedler, however, that on any property in which Friedler invested with Cole, the sellers would pay only twenty percent of a customary real estate commission to Coldwell Banker Commercial because he would waive his portion of the commission. Cole explained that the reduced commission paid by the sellers would result in immediate savings on the purchase price for the purchasers on transactions in which Cole was involved as a principal purchaser and where Coldwell Banker Commercial was an agent.

43.    Cole's proposal was attractive to Friedler because he was engaged in a medical practice, which prevented him from taking an active role in locating attractive investment opportunities and in the day-to-day management of this type of investment.

44.    Furthermore, because Cole represented that he would not receive a real estate commission or other compensation for his role, and that Cole would manage the properties without a fee in return for one-third ownership in the properties, Friedler believed that Cole's proposal represented a reasonable and safe investment opportunity.

45.    Cole's position with Coldwell Banker Commercial, and his representation that Coldwell Banker Commercial approved of his proposal, convinced Friedler that Cole could be trusted to deal fairly and honestly in his business dealings with investors.

46.    Relying on Cole's representations, in March, 2000, Friedler agreed to invest in an office building located at 22 West Padonia Road in Timonium, Maryland ("22 West Padonia Road"). Cole and Miller had recently acquired the ownership of 22 West Padonia Road by

acquiring all of the partnership interests in Padonia Tower Associates, LLP ("Padonia Tower Associates").

47.    Because Cole and Miller had recently acquired the 22 West Padonia Road property, Cole told Friedler that Friedler would be able to buy into that property at the price paid by Cole and Miller three months earlier.

48.    When Cole and Miller acquired the partnership interests in Padonia Tower Associates, some of the sellers were principals of OPF.  OPF and later Coldwell Banker Commercial and Coldwell Banker Title were also tenants at 22 West Padonia Road, and Cole's office was located in OPF's office which later became Coldwell Banker Commercial's office at that address.

49.    Friedler acquired his one-third interest in 22 West Padonia Road through SG Padonia, an entity that, for tax planning purposes, was the vehicle for a like-kind exchange for Friedler.

50.    At the time Friedler purchased his entity's interest in 22 West Padonia Road, Cole induced Friedler to refinance the loan that was secured by the property, based on Cole's false representations that Friedler's contribution would be the equivalent to the amount Cole and Miller each contributed to acquire the property three months earlier.

51.    In order to convince the bank to refinance the existing mortgage for 22 West Padonia Road, Friedler and SG Padonia personally guaranteed a loan from Harbor Bank in the amount of $4,000,000.  By Cole's choice and at his direction, Coldwell Banker Title acted as the settlement and escrow agent for the closing of SG Padonia's investment in 22 West Padonia Road.

52.    After the 22 West Padonia Road property was refinanced, Cole and Miller each retained a one-half ownership interest in Padonia Tower Associates, which owned two thirds of 22 West Padonia Road, and SG Padonia owned the remaining one-third interest of the property.

53.    At the time Friedler acquired an interest in 22 West Padonia Road through SG Padonia, Friedler did not know that Cole had overcharged Friedler by charging him more for a

one-third ownership interest in the property than Cole and Miller had paid just three months earlier.

54.    Between March 29, 2000 and July 17, 2002, Cole fraudulently induced Friedler to invest in four other office buildings.

55.    For each of these transactions, Cole represented to Friedler that the arrangement would work exactly as before.  Cole told Friedler that Cole was responsible for identifying investment opportunities in office buildings and he would handle all negotiations, contracting and managing responsibilities, without receiving compensation or receiving any real estate commissions, in return for a one-third ownership interest in the properties.

56.    Cole represented to Friedler that Cole remained responsible for making capital contributions in the same amount as the other partners.

57.    On May 21, 2001, Cole, Miller and Friedler acquired all of the ownership interest in Padonia West, the owner of an office building located at 201 West Padonia Road in Timonium, Maryland ("201 West Padonia"), for the purchase price of $3,225,000.  By Cole's choice and at his direction, Coldwell Banker Title acted as the settlement and escrow agent for the closing for the acquisition of Padonia West.

58.    In order to acquire the Padonia West entity, Friedler borrowed $2,475,000 from Susquehanna Bank.  Miller and Padonia West guaranteed that loan.

59.    Unbeknownst to Friedler at the time, at closing Cole instructed Coldwell Banker Title to transfer $200,000 of the loan proceeds received from Susquehanna Bank to B&N, an entity, on information and belief, controlled by Cole.

60.    Cole, Miller and Friedler each were assigned a one-third ownership interest in Padonia West.

61.    On June 21, 2001, Cole, Miller and Friedler acquired all of the membership interests in Riderwood from Riderwood Holdings, LLC ("Riderwood Holdings") for the purchase price of $2,300,000.  Riderwood owned an office building located at 1107 Kenilworth Avenue in Towson, Maryland (the "Riderwood Property").

12

62.    In order to acquire the Riderwood Property, Cole fraudulently induced Friedler to borrow $1,620,000 from Susquehanna Bank. Miller and Riderwood guaranteed the loan.

63.    By Cole's choice and at his direction, Coldwell Banker Title acted as the settlement and escrow agent for the Riderwood closing. At closing, unbeknownst to Friedler at the time, Cole fraudulently instructed Coldwell Banker Title to divert $250,000 of the loan proceeds received from Susquehanna Bank to B&N. Coldwell Banker Title, at Cole's direction, also paid Coldwell Banker Commercial a payment of $60,000 and a payment of $42,000 out of the loan proceeds at closing.

64.    In addition, some or all of the principals of Riderwood Holdings extended a loan to Riderwood in the form of seller financing for a portion of the purchase price for the ownership interest in the Riderwood entity. The seller financing was represented by a promissory note in the amount of $350,000 from Riderwood to DLS Exchange (the "DLS Exchange Note"). On information and belief, DLS Exchange is an entity that served as a tax-free exchange entity on behalf of some of the former owners of Riderwood Holdings.

65.    In the summer of 2001, Cole proposed to Friedler that they acquire an office building located at 200 Washington Avenue in Towson, Maryland (the "200 Washington Avenue Property"). Cole represented to Friedler that the property could be purchased at a good price and that he had another purchaser willing to buy it one year later for a large profit because of its proximity to Towson University and control of a related parking facility.

66.    The purchase price for the property, however, was $7,250,000, well above what the parties had paid for each of the previous three properties. Cole told Friedler that Miller could not afford to contribute enough capital to acquire 200 Washington Avenue and that they would need to locate an additional investor.

67.    Friedler approached Passen and told him about Cole's plan to acquire 200 Washington Avenue. Friedler told Passen of Cole's representation that he was not collecting a commission when the properties were acquired or charging a management fee to operate the

properties because Cole could not borrow or personally guarantee the acquisition financing from third party lenders.

68.     Cole met with Passen and confirmed this agreement and reiterated that he would contribute his share of the capital and would not accept any commission or other payment and that he would manage the properties without taking a fee.  In return for Cole's activities on behalf of the ventures, Friedler and Passen would borrow or personally guarantee the acquisition financing.

69.     Passen, like Friedler, found Cole's proposal attractive because it represented a solid investment without Passen having to be involved in locating real estate investment opportunities or day-to-day operations of the business.  Moreover, because Cole held himself out as Coldwell Banker Commercial's agent, Passen believed that Cole was reputable and would deal fairly and honestly in his business dealings with investors.

70.     Cole set forth his proposal for Passen to invest in 200 Washington Avenue in a letter dated June 8, 2001 bearing OPF's letterhead (the "June 8 Letter").  A copy of the June 8 Letter is attached hereto and incorporated herein as **Exhibit A**.  Cole caused the June 8 Letter to be sent to Passen by telecopy by way of the interstate telephone lines.

71.     The June 8 Letter outlined the terms upon which Passen would obtain a 25% interest in 200 Washington Avenue Limited Partnership (the "Washington Avenue Limited Partnership"), the entity that owned 200 Washington Avenue.

72.     Cole, who asserted that he was the contract purchaser for the 200 Washington Avenue property, assigned his rights under the purchase contract to Miller and Friedler, who would be the only partners of the Washington Avenue Limited Partnership, with Friedler a 35% general partner and Miller a 65% limited partner.

73.     After closing, Cole converted the Limited Partnership to 200 Washington Avenue, and Miller assigned a 15% interest to Cole, 25% to Friedler, and 25% to Slip & Shore, an entity through which Passen would hold his interest, leaving 35% for Miller.

74.    In return for his 25% interest in 200 Washington Avenue, Cole induced Passen to make a capital contribution of $200,000 in cash and loan another $1,250,000 to 200 Washington Avenue; $1,000,000 of Passen's investment was to be paid back within 60 days from settlement or within three years, and $250,000 was to be paid when the property was sold.

75.    Cole falsely represented to Passen that these loans would be used to acquire the 200 Washington Avenue property and that Cole would not receive any payments for his services at settlement or any payments related to the transaction.

76.    By Cole's choice and at his direction, Coldwell Banker Title acted as the settlement and escrow agent on this transaction. At closing, unbeknownst to Friedler and Passen at the time, Cole fraudulently instructed Coldwell Banker Title to pay Cole through B&N $500,000 and $100,500 to Coldwell Banker Commercial out of the money loaned by Passen. Cole also paid Coldwell Banker Commercial another $104,500 disguised as "leasing commissions", without the knowledge or authorization of the other members of 200 Washington Avenue.

77.    On information and belief, the lease for which Coldwell Banker Commercial received the "leasing commission" was already in place prior to the time of sale.

78.    In the summer of 2002, Cole told Friedler and Passen that Miller had experienced financial setbacks in other business dealings and, as a result, was unable to participate in further investments. Cole advised Friedler and Passen that he would continue to locate properties on the same terms as before with Cole, Friedler and Passen as the only investors.

79.    On July 17, 2002, Cole, Friedler and Passen purchased all of the ownership interests in TCP from Corporate Office Properties, L.P. ("Corpo") for the purchase price of $7,175,000. TCP is the owner of an office building located at Three Centre Park ("Three Centre Park") in Columbia, Maryland.

80.    By Cole's choice and at his direction, Coldwell Banker Title acted as the settlement and escrow agent for the closing on the purchase of the ownership interests of the

Three Centre Park property. Slip & Shore was the entity through which Passen invested in the Three Centre Park property.

81.     Cole fraudulently induced Friedler to borrow $5,760,000 from Susquehanna Bank to finance the Three Centre Park transaction, and that loan was guaranteed by TCP.

82.     At closing, Cole fraudulently directed Coldwell Banker Title to pay Cole through B&N $600,000 from the loan proceeds and $201,000 to Coldwell Banker Commercial, without the knowledge or authorization of Friedler and Passen.

83.     In addition, Cole also paid the seller, Corpo, or, on information and belief, an entity related to Corpo, $125,000 disguised as a "financing fee", from the funds received from Susquehanna Bank, without the knowledge or authorization of Friedler or Passen.    After settlement, Cole also paid $110,000 to Coldwell Banker Commercial and $31,500 to Dennis German, an individual who worked for Cole and Coldwell Banker Commercial, without Friedler's or Passen's knowledge or consent.

84.     After the transaction closed, Cole, Friedler and Slip & Shore each owned a one-third interest in TCP.

85.     In the Spring of 2003, Cole approached Friedler and Passen and again advised them that Miller was experiencing business reversals that left him short of cash and that Miller wished to sell his interest in Padonia Tower, Padonia West and Riderwood.[1]  Cole represented that he could negotiate a "good price" to buy out Miller's interest in those entities.

86.     Cole represented to Passen that Miller's capital accounts for each entity were current and paid in full.  Cole also represented that Passen would acquire all of Miller's interest in the properties and ownership entities and that Miller had not sold or transferred anything of value relating to those interests.

87.     Cole also provided Passen with certain financial information concerning the properties and ownership entities that indicated that they were in sound financial condition.

---

[1] Miller had previously sold all of his interest in 200 Washington Avenue to Passen's children.

88.     Based on Cole's representations, Passen agreed to buy out Miller.  Cole, acting as a go between, handled all of the negotiations with Miller for Passen.

89.     On April 1, 2003, Passen and Miller entered into an Assignment of Partnership and Membership Interests (the "Miller Assignment"), whereby Miller assigned to Gemini Realty, an entity that held some of Passen's real estate investments, all of his right, title and interest in Padonia Tower, Padonia West and Riderwood.  A copy of the Miller Assignment is attached hereto and incorporated herein as **Exhibit B.**

90.     As of April 1, 2003, Miller had extricated himself from all investments that Cole had orchestrated where Friedler and Passen were also involved.

91.     On July 8, 2003, Cole negotiated the purchase of all of the membership interests in Woodside, an entity which owns an office building located at 6325 Woodside Drive in Columbia, Maryland ("Woodside Drive") for the purchase price of $4,750,000 from Kluge and Finkelstein ("K&F").

92.     In order to complete the transaction, Cole induced Passen to borrow $3,300,000 from Susquehanna Bank (the "Susquehanna Woodside Loan") by falsely representing that this sum was necessary to pay the purchase price.  In addition, Cole told Friedler and Passen that the seller would have to take back financing for a portion of the purchase price in the form of a promissory note in the principal amount of $1,000,000 from Woodside.  Woodside guaranteed the Susquehanna Woodside Loan undertaken by Passen.

93.     By Cole's choice and at his direction, Coldwell Banker Title acted as the settlement and escrow agent during the closing for Woodside.  At closing, Cole fraudulently instructed Coldwell Banker Title to pay $100,000 to Coldwell Banker Commercial, $18,000 more than Coldwell Banker Commercial was entitled to receive.  Cole also instructed Coldwell Banker Commercial to pay Corridor $82,000.

94.     Passen, Friedler and Cole were each assigned a one-third ownership in Woodside.

95.     During all of the above-described transactions, Cole discouraged Friedler and Passen from attending the closings by telling them that investors negotiated too much away at

the closing table. Cole convinced Friedler and Passen that it would be better for them to sign all necessary documents in advance of closing and Cole would then attend the closings alone.

96.    Cole also represented to Friedler and Passen that he would retain legal counsel to handle the documentation of the transactions on behalf of the investors. Cole controlled all communications with that lawyer who acted at the behest of Cole.

97.    Based on Cole's representations, and because Friedler and Passen felt their interests were protected with Coldwell Banker Title acting as the settlement and escrow agent, Cole delivered documents for Friedler's and Passen's signature in advance of closing and he attended the closings alone.

98.    At all times between March 2000 and January 2004, Cole was responsible for handling all aspect of the day-to-day management of the properties in which Friedler and Passen had an interest together with Cole (except for major decisions that required the consent of all members).

99.    Cole and Bart retained exclusive control of the rent rolls, the books and records and other accounts of Padonia Tower Associates, Padonia West, Riderwood, 200 Washington Avenue, TCP and Woodside (hereafter, the "Investment Entities").

100.    At all times between March 2000 and January 2004, Cole made monthly payments to Friedler and Passen that he represented to be distributions from their investments in 22 West Padonia Road, 201 West Padonia, the Riderwood Property, the 200 Washington Avenue Property, Three Centre Park and Woodside Drive (hereafter, the "Investment Properties").

101.    In late 2003, Passen and Friedler became suspicious of Cole's actions in managing the Investment Properties. When Friedler approached Cole about his concerns, Cole went to Passen and told him he could no longer be partners with Friedler because Cole did not trust him, and Cole would sell Passen all of his interest in the Investment Properties for a "good price".

102.    Cole, however, refused to release all of the books and records and other documentation relating to the Investment Properties prior to entering into an agreement to sell his

share of the Investment Entities to Lighthouse Point ("Lighthouse Point"), an entity in which Passen is the managing member.

103.    On January 1, 2004, Cole and Passen executed an Assignment of Membership Interest (the "Cole Assignment"). A true and correct copy of the Cole Assignment is attached hereto as **Exhibit C**. Under the terms of the Cole Assignment, Cole agreed to sell Lighthouse Point all of his right, title and interest in the Investment Properties for a total amount of $2,000,000.

104.    In addition, Cole, Friedler and Passen each held a one-third interest in Old Pad and Old Pad II, entities that owned two buildable lots located in Timonium, Maryland. As further consideration for the Cole Assignment, Friedler and Passen agreed to assign to Cole their interest in Old Pad and Old Pad II pursuant to the terms of an Assignment of Membership Interests dated January 1, 2004 (the "Old Pad Assignment"). A true and correct copy of the Old Pad Assignment is attached hereto as **Exhibit D**.

105.    Under the terms of the Cole Assignment, Cole agreed to immediately turn over to Passen all of the books and records of all of the Investment Entities and Investment Properties in which Friedler and Passen had invested.

106.    After executing the Cole Assignment, Cole turned over some, but not all, of the books and records of the Investment Entities and Investment Properties.

107.    After receiving the books and records from Cole, and obtaining other documents and information from additional sources, Friedler and Passen learned for the first time of Cole's fraudulent conduct and other irregularities in Cole's handling of their investments.

108.    Friedler and Passen discovered that Cole had entered into contracts of sale with the sellers of the Investment Properties prior to inducing Friedler and Passen to enter into the transactions with Cole. In these contracts, Cole or Coldwell Banker Commercial was recognized as the listing broker in the body of the contract of sale. This arrangement was expected by Friedler and Passen and was in accordance with the prior representations made to them by Cole, i.e., that OPF or Coldwell Banker Commercial would receive its customary twenty percent of the

commission otherwise due on the transaction, and that Cole would waive the remainder of commission otherwise due to him under his arrangement with OPF and Coldwell Banker Commercial.

109.    Unbeknownst to Friedler and Passen, the contracts Cole presented to them to review in order to induce them to become investors with Cole were not the total contract documents entered into by Cole and the sellers of the Investment Properties. Instead, Cole and the sellers of the Investment Properties entered into addenda to the contracts in which the seller would agree to pay specified sums to one or all of the following brokers or real estate agents not recognized in the body of the contracts: entities controlled by Cole or in which, on information and belief, Cole had an interest; other brokers or agents with whom Cole worked at OPF and/or Coldwell Banker Commercial; or brokerage firms in which principals of the sellers were brokers. These fraudulent arrangements significantly increased the cost to Friedler and Passen of acquiring their interests in the Investment Properties and the Investment Entities.

110.    Friedler and Passen also learned for the first time that Cole had approached the sellers of the Investment Entities and offered them premium prices for the Investment Properties and in return they agreed that Cole would receive enormous payments at settlement that, due to the increased purchase prices, were actually being paid by Friedler and Passen. This arrangement of paying additional sums to Cole-controlled entities, other OPF and/or Coldwell Banker Commercial agents or brokers, or brokerage firms with whom principals of the sellers were affiliated, had previously never been revealed to Passen or Friedler by Cole or the sellers of the Investment Properties.

111.    Cole had frequent contact with loan officers of the banks which provided acquisition financing for the Investment Properties. However, Cole did not disclose to the loan officers that Cole was receiving huge fees, nor did he provide to the loan officers copies of the addenda to the contracts, fraudulently inducing them to believe his representations that the only commissions paid to Coldwell Banker Commercial as part of the purchase prices were those set forth in the body of the contracts.

112.    Instead, Cole provided to Friedler, Passen, and the lending institutions, the basic body of the contracts of sale only, without disclosing that Cole and others cooperating with him actually received large sums of money at the settlements from Coldwell Banker Title, at the direction of Cole.

113.    Cole would also instruct Coldwell Banker Title to prepare two sets of settlement statements at the closings on the acquisition of the Investment Properties, one showing only the buyers' expenses and credits and the other showing only the sellers' expenses and credits. The payments to the entities controlled by Cole or others at his direction only appeared on the sellers' statements.

114.    Cole did not provide information regarding the sellers' settlement statements to Friedler or Passen or to the lending institutions which financed the acquisitions, and Cole fraudulently purported to execute the contrived settlement statements on behalf of Friedler and Passen, without their authorization to do so.

115.    In order to conceal his fraudulent conduct from Friedler, Passen, and the lending institutions providing the acquisition financing, Cole and others under his control intentionally did not provide to Friedler, Passen or the lending institutions the original contracts of sale or the sellers' side of the settlement statements. Cole and others under his control or direction concealed these documents from Friedler, Passen, and the lending institutions during the latter's review of the contracts and settlement statements before and after the settlements, and also omitted these documents from the closing binder of settlement documents provided to them which were often delivered several months after the closings occurred.

116.    Friedler and Passen also learned that Cole never contributed his share of the capital required to acquire the Investment Properties. Moreover, Cole fraudulently manipulated his capital accounts so that they appeared to be much higher than they rightfully should have been. In reality, Cole's capital accounts in the Investment Entities were short over $1,000,000.

117.    On January 30, 2004, Friedler and Passen learned for the first time of the existence of a money market account opened at Susquehanna Bank in July of 2003 in the name

of Woodside (the "Woodside Account"). This secret Woodside Account was or should have been for the benefit of Woodside's members.

118. Until January 30, 2004, the Woodside Account was under the exclusive control of Cole and Bart, his assistant. Neither the existence of the Woodside Account nor the deposits into or withdrawals from the Woodside Account was ever disclosed to Friedler or Passen prior to their discovery of it.

119. In August, 2003, a check in the amount of $450,000 was deposited in the Woodside Account without disclosure to Friedler or Passen. The check was given to Cole at the Woodside settlement and made payable to Woodside by K&F, the sellers of the ownership interests in Woodside that were purchased by Cole, Friedler and Passen. On information and belief, that check was ostensibly issued to compensate the new owners of Woodside for a payment made by a tenant of Woodside in connection with the early termination of the tenant's lease.

120. Instead of ensuring that those funds were held in trust for Woodside's members, Cole deposited the check into the secret Woodside Account, and Cole never disclosed or accounted to the other members of Woodside for the existence of the funds.

121. Shortly after the settlement on the purchase of the Woodside Drive property, Colliers-Pinkard, the property management company, issued a check to Woodside in the amount of $43,916.55 that, once again, was for the benefit of Woodside's members. That check was also deposited into the secret Woodside Account, without disclosure or accounting to Friedler or Passen.

122. In September of 2003, Coldwell Banker Title issued a check in the amount of $4,104.88 to Woodside to reimburse the entity for overpaid estimated real property taxes collected by Coldwell Banker Title at settlement. This sum was deposited into the secret Woodside Account in the name of Woodside, without disclosure or accounting to Friedler or Passen.

123.    In October of 2003, three months after Cole received the $450,000 check from K&F, a check in the amount of $450,000 was drawn on the secret Woodside Account and made payable to Cole, personally, and deposited into Cole's personal bank account, again without disclosure or accounting to Friedler or Passen.

124.    In August of 2003, Colliers Pinkard issued another check to Woodside, this time in the amount of $1,635.76. That check was also deposited into the secret Woodside Account, without disclosure or accounting to Friedler or Passen.

125.    Also in August of 2003, a check in the amount of $25,000 was written from the secret Woodside Account to Ronald Baquol ("Baquol"), a home builder, as Cole's portion of a personal investment in a house being built on speculation for sale by Baquol.

126.    After Cole and Passen entered into the Cole Assignment, Bart directed Susquehanna Bank to continue to send all account information for the secret Woodside Account to Cole's business address rather than to Passen's office where the bank had been directed to begin to send all account information for Woodside.

127.    In addition, the bank records indicate that someone who had previously been an authorized signatory on the secret Woodside Account attempted to close the account by requesting the issuance of a check against the remaining balance in the account. That check was apparently made payable to Woodside for the remaining balance in the approximate amount of $25,000.

128.    After Friedler and Passen took over the exclusive management of the properties from Cole, they also discovered that Cole had failed to manage the properties in a commercially reasonable manner. Real property taxes were not paid on three of the properties (in fact, one property was sold at a tax sale) while Cole was managing the affairs of the Investment Properties.

129.    Cole failed to disclose that he was in possession of a Mercedes S500 that was apparently leased to "Padonia Towers Assoc LP" (an abbreviation of the name of the entity

called Padonia Tower Associates, LLP).    This lease was never disclosed to either Passen or Friedler prior to Passen's entry into the Cole Assignment.

130.    Capital accounts noted on the books of the various entities did not conform to the tax returns of the members.  Cole had failed to make his contribution to the capital accounts of the various membership and partnership interests Cole sold to Passen, which were short $1,072,430.28.

131.    In addition, Cole owed $150,000 for an undisclosed and unauthorized loan made to Cole by Padonia Tower Associates.

<u>COUNT ONE</u>

**Violation of The Racketeering Influenced**
**<u>And Corrupt Organization Act § 18 U.S.C. §1962(a)</u>**
**(Cole, B&N, Padonia Management, Bart,**
**Coldwell Banker Commercial, Coldwell Banker Title, Miller)**

132.    Plaintiffs incorporate here all of the preceding paragraphs.

133.    As set forth above, Cole handled all aspects of the negotiations, documentation, closing and managing of the various investments involving Friedler and Passen.

134.    In that role, Cole attended the closings where Passen's and Friedler's investments were entrusted to Coldwell Banker Title.  For each investment and at those closings, Cole intended to defraud Friedler and Passen out of a substantial amount of their investments by diverting those funds to B&N and other entities controlled by Cole.

135.    Each investment and each closing with which Friedler and/or Passen became involved, because of Cole's fraudulent acts and misrepresentation, comprises a separate predicate act.  Cole's fraudulent activities and misrepresentations were conducted over a number of years.  Cole defrauded Friedler and Passen through a pattern of racketeering activity that included at least two predicate acts occurring within the last ten years.

136.    B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and Miller are persons within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

137.    B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and/or Miller, or any combination of those individuals and entities, along with other entities or individuals, both known and unknown, and not now named as defendants in this action, constitute an enterprise ("Enterprise") pursuant to 18 U.S.C. § 1961(4), the activities of which affected interstate or foreign commerce.

138.    At all times relevant to this action, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and Miller and other entities, both known and unknown, or a combination of those entities, constitute an association-in-fact.

139.    At all times relevant to this action, Cole has directed, been employed by, and/or been associated with the Enterprise.

140.    In or about March, 2000 through January 2004, Cole, through discussions and negotiations undertaken in person and through the use of the mails, the telephone, facsimile and/or email communications in interstate commerce, fraudulently induced Friedler and Passen to invest in a series of real estate deals through which Cole misappropriated Friedler's and Passen's investments in office buildings in the Baltimore metropolitan market.

141.    Cole, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title, Miller and/or other entities, have each received income, directly or indirectly, from this pattern of racketeering activity and has used that income, or part of it, or proceeds from it, in acquisition of an interest in the Enterprise, in the establishment of the Enterprise and/or in the operation of the Enterprise, which engages in, and affects interstate and foreign commerce. The injury to Plaintiffs' business was by reason of Cole, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title, and Miller's use and investment of the income in the Enterprise and/or the establishment or operation of the Enterprise.

142.    Cole induced Friedler and Passen to enter into the above described investments by knowingly making the following false representations to Friedler and Passen on numerous occasions from March, 2000 through January 2004, through the use of the mails, as well as

through the use of telephones, cell phones, Nextel Direct Connect, facsimiles, and/or e-mails in interstate commerce:

    a.    Cole would locate attractive real estate investments in office buildings located in the Baltimore metropolitan area for investment purposes;

    b.    Cole would negotiate contracts of sale and attend closings without charge or receipt of any real estate commission or other fee that might be due to Cole;

    c.    If Friedler and Passen personally obtained and/or guaranteed the financing, Cole, Friedler and Passen would each share equally in the ownership of the properties and entities;

    d.    Cole would be responsible for all day-to-day activities associated with the management of the properties after they were purchased, without charge or compensation;

    e.    Cole would contribute capital to the entities in the same amounts as Friedler and Passen;

    f.    Coldwell Banker Title would act as a disinterested settlement and escrow agent on all closings.

143.    Friedler and Passen justifiably relied on the foregoing false representations made by Cole in making investments in real estate deals organized and managed by Cole.

144.    Cole's predicate acts evidence a continuing pattern of related racketeering activity. Cole has repeatedly utilized the mails, the telephone, and other communications by facsimile and e-mail in the conduct of the Enterprise to defraud Friedler and Passen of their investments.

145.    On many occasions, Cole called, mailed and sent by telecopy information relating to the terms of the investments set up by Cole from Coldwell Banker Commercial's office.

146.    Plaintiffs have been damaged in their business and property by the subject pattern of racketeering activity Cole directed against them through the Enterprise, in that, *inter alia*,

Friedler and Passen provided payments and other things of value, such as cash, bank financing and personal guarantees, to acquire the Investment Properties.

147.    As set forth above, Cole has repeatedly engaged in a pattern of conduct in which he gains the confidence of his intended victims through communications by telephone, mail, e-mail and facsimile that misrepresented the terms of the investment deals Cole was negotiating.

148.    Cole also used his position and connection with Coldwell Banker Commercial to convince Friedler and Passen that they were dealing with a reputable real estate investor who could be trusted to handle faithfully and honestly all aspects of their agreement.

149.    Cole then used this confidence and his position with Coldwell Banker Commercial to defraud the investors out of their capital and their interest in the Investment Entities. Cole also used his position and influence with Coldwell Banker Commercial to conceal his fraudulent conduct from Friedler and Passen so that he could continue his fraudulent scheme.

150.    Cole induced Friedler to invest $1,670,000 in 22 West Padonia Road and personally guarantee the refinancing of that property by falsely representing that Friedler would pay one-third of the initial purchase price paid by Cole and Miller three months earlier.

151.    In reality, unbeknownst to Friedler, Cole charged Friedler more than what Friedler should have paid if he was charged only one-third of what Cole and Miller paid for the property three months earlier.

152.    When Friedler invested in Padonia West, Cole induced him to borrow $2,475,000 from Susquehanna Bank based on Cole's false representation that Cole would not receive a real estate commission and the investor would therefore be getting a better deal.

153.    On April 19, 2001, prior to closing on Padonia West, Coldwell Banker Title's closing agent, Carol Ann Wildesen, Esquire  ("Wildesen"), memorialized her conversation with

Coldwell Banker Commercial's President, John Evans ("Evans"), concerning the fact that Coldwell Banker Title did not have written confirmation of the sales price or commissions for the closings of Padonia West, Riderwood or 200 Washington Avenue. See Memorandum dated April 19, 2001 attached hereto and incorporated herein as **Exhibit E.**

154.    Wildesen confirmed that Cole had not given Coldwell Banker Title any of the sales contracts and had only given verbal instructions on payments to be made to B&N. Wildesen also confirmed that Coldwell Banker Commercial, through Evans, had instructed Coldwell Banker Title to make the payments to B&N "from the settlement sheets" even though Coldwell Banker Title did not have copies of the contracts of sale or written confirmation that B&N was to receive a commission for these transactions.

155.    Neither Coldwell Banker Commercial nor Coldwell Banker Title ever confirmed with Friedler or Passen the legitimacy of these transactions.

156.    At closing, Cole directed Coldwell Banker Title to divert $200,000 of the loan proceeds from Susquehanna Bank to B&N. Coldwell Banker Commercial and Coldwell Banker Title knew that B&N was an entity controlled by Cole.

157.    Cole was able to hide his fraudulent conduct from Friedler, Passen and Susquehanna Bank by directing Coldwell Banker Title to prepare two settlement statements, one showing the buyer's deductions and the other showing the seller's deductions. Only the seller's settlement statement identified any payments to B&N.

158.    Because Coldwell Banker Title, at Coldwell Banker Commercial's instruction, paid B&N "from the settlement sheets" and because Friedler and Passen were not provided with the separate settlement sheet showing payments to B&N, Cole was able to conceal his fraudulent conduct from Friedler and Passen.

159.    When Cole handled the Riderwood investment, he directed Coldwell Banker Title to pay himself, through B&N, $250,000 from the settlement proceeds.  In addition, Coldwell Banker Title relied on fraudulent documents prepared by Cole that resulted in unauthorized payments to OPF and Coldwell Banker Commercial, without performing the duties of a disinterested settlement and escrow agent.

160.    Cole never provided Coldwell Banker Title any written addenda that authorized Coldwell Banker Title to pay B&N $250,000 at settlement.  Instead, pursuant to Coldwell Banker Commercial's instructions to Coldwell Banker Title, Coldwell Banker Title paid B&N "from the settlement sheets" that were prepared separately so that those payments could be concealed from Friedler and Passen.

161.    Cole fraudulently induced Friedler and Passen to invest in 200 Washington Avenue by falsely representing he would negotiate a good price and not collect any real estate commission.  At closing, Cole secretly directed Coldwell Banker Title to pay B&N $500,000 from the proceeds of Passen's capital contribution and other loans that Cole falsely represented would be used to pay the purchase price.  Cole also directed Coldwell Banker Title to pay Coldwell Banker Commercial $104,500, which was disguised as a "leasing commission" for a tenant that was already under lease prior to the time of the settlement.

162.    At closing, Coldwell Banker also made checks payable in the amounts of $24,144.39 and 101,388.77 from the loan proceeds to Padonia Tower Associates at Cole's direction without proper documentation.  Cole failed to disclose or properly account for these payments to the other members of Padonia Tower Associates.

163.    Cole also entered into an agreement with the seller to increase the list price of the Riderwood property so that Cole could defraud Friedler and Passen out of additional sums.  In

return for this agreement, Cole agreed to give DLS Exchange, an entity, on information and belief, controlled by the seller, $350,000 in the form of a promissory note to be paid by Riderwood.  Cole also secretly directed Coldwell Banker Title to pay Corridor Commercial $60,000.

164.    Cole fraudulently induced Passen to purchase Miller's interest in the Investment Properties for $1,375,000 by promising him he would negotiate a good price and that Miller had not sold or otherwise disposed of any of his interest.

165.    After Passen executed the Miller Assignment, Cole claimed that Miller had assigned to Cole a capital account worth $240,000.

166.    When Cole arranged the acquisition of TCP, he fraudulently inflated the original listing price in order to increase the amount of money he could defraud from Friedler and Passen.

167.    In return for the seller's agreement to go along with Cole's scheme, Cole paid Corpo a $125,000 bribe disguised as a "finance fee."

168.    In order to fund this fraud, Cole fraudulently induced Friedler to borrow $5,760,000 from Susquehanna Bank on the false representation that it was needed to cover the purchase price and Cole would not be paid a commission.  At closing, Coldwell Banker Title, at Cole's direction, paid Cole, through B&N, $600,000 out of Susquehanna Bank's loan proceeds.

169.    After closing, Cole also fraudulently directed Coldwell Banker Title to pay $31,500 to German, Coldwell Banker Commercial's agent, who provided no real estate brokerage services, and that payment is not set forth on the settlement statements.  This payment was made without Friedler's or Passen's knowledge or authorization.

170.    In order to purchase Woodside Drive, Cole fraudulently induced Passen to borrow $3,300,000 from Susquehanna Bank, based on the false representation that the money was necessary to cover the purchase price of the property.

171.    Cole arranged this additional "financing" while at the same time arranging for K&F to pay Woodside $450,000 for "leasing credits". Cole deposited the $450,000 check in the secret Woodside Account, which was under the exclusive control of Cole and Bart, and subsequently diverted those funds for use by the Enterprise. Cole also directed other amounts that were to be held in trust for the Woodside members to his own use through the secret Woodside Account.

172.    Coldwell Banker Commercial and Coldwell Banker Title knew or should have known that Friedler and Passen did not know about and would not have authorized payments of their investment money to Cole through B&N.

173.    B&N, on information and belief, was not registered or licensed in Maryland as a real estate broker. In Maryland it is illegal for an unlicensed individual or entity to receive real estate commissions, and Coldwell Banker Commercial and Coldwell Banker Title knew or should have known that B&N was not registered or licensed in Maryland.

174.    As the escrow agent, Coldwell Banker Title was legally obligated to act as a disinterested party that owed a fiduciary duty to both the seller and the buyer. As such, Coldwell Banker Title was required to conduct the closings with scrupulous honesty, skill, and diligence.

175.    Coldwell Banker Title breached its fiduciary duty as escrow agent by, among other things, acting in Cole's and Coldwell Banker Commercial's interest, and contrary to Friedler's and Passen's interest.

176.    B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and Miller received income from Cole's pattern of racketeering activity, which they used in the operation of an enterprise affecting interstate commerce.

177.    While Cole was responsible for managing the properties, Cole fraudulently made various payments from the accounts of the entities to Padonia Management and other activities controlled by Cole.  Cole diverted these payments to the Enterprise and to other entities and individuals, both known and unknown, that Cole controlled.

178.    Cole also falsely represented to Friedler and Passen that he would contribute equally in proportion to each of the investors.  Cole, however, never made capital contributions to the Investment Entities, despite his repeated representations that he had.  Cole's capital accounts in the Investment Entities are short over $1,000,000.

179.    Cole also negotiated directly with Susquehanna Bank on Friedler's behalf whereby he fraudulently represented or intentionally withheld material information in order to obtain financing for these transactions.

180.    Cole defrauded Friedler out of $50,000 that Cole fraudulently represented was needed as a down payment on another illegal scheme to purchase an office property that was never consummated.

181.    Bart participated in Cole's illegal activities by making numerous misrepresentations to Friedler and Passen concerning the nature and status of their investments in the Investment Entities.  In addition, Bart frequently had Friedler and Passen execute documents that she knew were to be used for fraudulent purposes.  Bart, in return for her participation in Cole's pattern of racketeering activities, received payments from Cole and/or entities controlled by Cole, which she used to operate an enterprise that affected interstate commerce.

182.    Miller participated in Cole's racketeering activity by fraudulently inducing Friedler into investing with Cole by representing that Cole was honest, could be trusted and was a reputable broker with Coldwell Banker Commercial when he knew that Cole intended to defraud Friedler.

183.    Miller also conspired with Cole to defraud Passen by inducing Passen to enter into the Miller Assignment when he knew that Cole had significantly reduced the value of the Investment Entities through his fraudulent activities. Miller sold his interest in the Investment Entities to Slip & Shore for an artificially inflated price by failing to disclose material terms that he had a duty to disclose.

184.    Miller used the funds received for the Miller Assignment to operate an enterprise that affected interstate commerce.

WHEREFORE, Plaintiffs demand judgment against Henry L. Cole, Jr., B&N Realty Incorporated, Padonia Management, LLC, Patricia Bart, NRT Mid-Atlantic Title Services, LLC t/a Coldwell Banker Title Services, NRT Mid-Atlantic, Inc. t/a O'Connor, Piper & Flynn ERA and Coldwell Banker Commercial NRT and David Miller in an amount to be proven at trial of at least $7,000,000, treble damages, and an award of attorneys' fees and costs, plus interest, and such further relief as the Court may deem just.

## COUNT TWO

### Violation of The Racketeering Influenced
### And Corrupt Organization Act § 18 U.S.C. §1962(c)
### (Cole)

185.    Plaintiffs incorporate here all of the preceding paragraphs.

186.    B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and/or Miller, or any combination of these individuals and entities, along with other entities or individuals, both known and unknown, and not now named as defendants in this

action, constitute an enterprise ("Enterprise") pursuant to 18 U.S.C. § 1961(4), the activities of which affected interstate or foreign commerce.

187.    At all time relevant to this action, Cole has directed, been employed by, and/or been associated with the Enterprise.

188.    At all times relevant to this action, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and/or Miller and other entities, both known and unknown, or a combination of those entities, constitute an association-in-fact.

189.    In or about March, 2000 through January 2004, Cole, through discussions and negotiations undertaken in person and through the use of the mails, and the telephone, facsimile and/or email communications in interstate commerce, fraudulently induced Friedler and Passen to invest in a series of real estate deals through which Cole misappropriated Friedler's and Passen's investments in office buildings in the Baltimore metropolitan market.

190.    Cole received income from this pattern of racketeering activity and has used that income, or part of it, or proceeds from it, in acquisition of an interest in the Enterprise, in the establishment of the Enterprise and/or in the operation of the Enterprise, which engages in, and affects interstate and foreign commerce. The injury to Plaintiffs' business was by reason of their use and investment of the income in the Enterprise and/or the establishment or operation of the Enterprise.

191.    Cole induced Friedler and Passen to enter into the above described investments by knowingly making the following false representations to Friedler and Passen on numerous occasions from March, 2000 through January 2004, through the use of the mails, as well as through the use of telephones, cell phones, Nextel Direct Connect, facsimiles, and/or e-mails in interstate commerce:

      a.    Cole would locate attractive real estate investments in office buildings located in the Baltimore metropolitan area for investment purposes;

b.  Cole would negotiate contracts of sale and attend closings without charge or receipt of any real estate commission or other fee that might be due to Cole;

c.  If Friedler and Passen personally obtained and/or guaranteed the financing, Cole, Friedler and Passen would each share equally in the ownership of the properties and entities;

d.  Cole would be responsible for all day-to-day activities associated with the management of the properties after they were purchased, without charge or compensation;

e.  Cole would contribute capital to the entities in the same amounts as Friedler and Passen;

f.  Coldwell Banker Title would act as a disinterested settlement and escrow agent on all closings.

192.  Friedler and Passen justifiably relied on the foregoing false representations made by Cole in making investments in real estate deals organized and managed by Cole.

193.  Cole's predicate acts evidence a continuing pattern of related racketeering activity. Cole has repeatedly utilized the mails, the telephone, and other communications by facsimile and e-mail in the conduct of the Enterprise to defraud Friedler and Passen of their investments.

194.  On many occasions, Cole called, mailed and sent by telecopy information relating to the terms of the investments set up by Cole from Coldwell Banker Commercial's office.

195.  Plaintiffs have been damaged in their business and property by the subject pattern of racketeering activity Cole directed against them through the Enterprise, in that, *inter alia*, Friedler and Passen provided payments and other things of value, such as cash, bank financing and personal guarantees, to acquire the Investment Properties.

196.  As set forth above, Cole has repeatedly engaged in a pattern of conduct in which he gains the confidence of his intended victims through communications by telephone, mail, e-mail and facsimile that misrepresented the terms of the investment deals Cole was negotiating.

197.    Cole also used his position and connection with Coldwell Banker Commercial to convince Friedler and Passen that they were dealing with a reputable real estate investor who could be trusted to handle faithfully and honestly all aspects of their agreement.

198.    Cole then used this confidence and his position with Coldwell Banker Commercial to defraud the investors out of their capital and their interest in the Investment Entities. Cole also used his position and influence with Coldwell Banker Commercial to conceal his fraudulent conduct from Friedler and Passen so that he could continue his fraudulent scheme.

199.    Coldwell Banker Commercial and Coldwell Banker Title received income from Cole's pattern of racketeering activity, which they used in the operation of an enterprise affecting interstate commerce.

200.    While Cole was responsible for managing the properties, Cole fraudulently made various payments from the accounts of the entities to Padonia Management and other activities controlled by Cole. Cole diverted these payments to the Enterprise and to other entities and individuals, both known and unknown, that Cole controlled.

201.    Cole also falsely represented to Friedler and Passen that he would contribute equally in proportion to each of the investors. Cole, however, never made capital contributions to the Investment Entities, despite his repeated representations that he had. Cole's capital accounts in the Investment Entities are short over $1,000,000.

WHEREFORE, Plaintiffs demand judgment against Henry L. Cole, Jr. in an amount to be proven at trial of at least $7,000,000, treble damages, and an award of attorneys' fees and costs, plus interest, and such further relief as the Court may deem just.

## COUNT THREE

### Violation of The Racketeering Influenced And Corrupt Organization Act 18 U.S.C. §1962(d) (Cole, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title, Miller)

202.    Plaintiffs incorporate here all of the preceding paragraphs.

203.    Between March 29, 2000 and January 2004, the Enterprise, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title and Miller conspired to defraud Friedler and Passen of their investments in commercial real estate.

204.    Cole, through his position and connection with Coldwell Banker Commercial and Coldwell Banker Title, conspired with Coldwell Banker Commercial and Coldwell Banker Title to prepare fraudulent settlement statements and to conceal the object of the Enterprise's conduct from Friedler, Passen and their lenders. Without Coldwell Banker Commercial's and Coldwell Banker Title's participation in the conspiracy, the Enterprise's fraudulent conduct would not have occurred or would have been discovered sooner.

205.    Coldwell Banker Commercial fraudulently instructed Coldwell Banker Title to pay B&N "from the settlement sheets" when it knew that Cole had not given Coldwell Banker Title written authorization that B&N was entitled to receive a commission. Coldwell Banker Commercial knew or should have known that B&N was not licensed as a real estate broker and that it was not authorized to receive payments at closing.

206.    In return for Coldwell Banker Commercial's and Coldwell Banker Title's participation in the conspiracy, the Enterprise paid Coldwell Banker Commercial and Coldwell Banker Title fees and other payments it had not earned and to which it had no legitimate claim.

207.    At all times relevant herein, Bart who was employed by Coldwell Banker Commercial, was also employed by or associated with the Enterprise. Bart was responsible for many aspects of the Enterprise's day-to-day activities.

208.    Bart, in her position as an employee of the Enterprise, made numerous false statements concerning Friedler's and Passen's investments.  Furthermore, Bart participated in concealing the Enterprise's fraudulent conduct through false statements to Friedler and Passen.

209.    Among other things, Bart had access to and control of the accounts of the entities that owned the investment properties and the accounts of Padonia Management.

210.    Bart personally transferred funds from accounts held in trust for the members of the Investment Entities that owned the properties to secret accounts controlled by the Enterprise.

211.    Bart participated in the Enterprise's activities through numerous communications with Friedler and Passen concerning the investments, which she knew to be fraudulent.

212.    Miller fraudulently induced Friedler into investing in the Investment Entities knowing that Cole intended to defraud Friedler.  Miller also conspired to fraudulently induce Passen into entering into the Miller Assignment whereby Miller received an artificially inflated price for his interest in the Investment Entities.

213.    These fraudulent communications and activities occurred through the use of the mails, and the telephone, facsimile and/or email communications in interstate commerce.

214.    Each of the co-conspirators agreed to the furtherance of the conspiracy through the Enterprise's commitment of the predicate acts, knowing that the acts were part of a pattern of racketeering activity.

215.    The co-conspirator's conduct has caused injury to Plaintiffs in that it has resulted in the loss of substantial amount of their investment in the Investment Properties.

216.    The conspiracy has caused injury to Plaintiffs' business or property by those overt acts.

WHEREFORE, Plaintiffs demand judgment against Henry L. Cole, Jr., B&N Realty Incorporated, Padonia Management, LLC, Patricia Bart, NRT Mid-Atlantic Title Services t/a Coldwell Banker Title Services, NRT Mid-Atlantic Title Services, LLC t/a O'Conor, Piper & Flynn ERA and Coldwell Banker Commercial Services NRT and David Miller in an amount to

be proven at trial of at least $7,000,000, treble damages, and an award of attorneys' fees and costs, plus interest, and such further relief as the Court may deem just.

### COUNT FOUR

### FRAUD/INTENTIONAL MISREPRESENTATION
(Cole, Bart, Coldwell Banker Commercial,
Coldwell Banker Title, Miller, DLS Exchange, Corridor, H-200, 200 L.P., VI-4)

217.    Plaintiffs incorporate here all of the preceding paragraphs.

218.    Cole's fraudulent conduct consisted of numerous false representations of material fact to Friedler and Passen concerning the nature of their real estate investments.

219.    Those false representations consisted of, among other things, Cole's false representations that he would not take a real estate commission or other fee from the purchase of the Investment Properties, in return for an ownership interest in the Investment Enterprises.

220.    Cole also falsely represented to Friedler and Passen that he would manage the properties without charge to the investors.  Cole further fraudulently concealed his conduct by failing to disclose material facts where he was duty bound to do so.

221.    Cole also made numerous fraudulent misrepresentations and failed to disclose material facts in the documents and other information provided to Friedler and Passen concerning the Investment Properties.

222.    At the time Cole made the fraudulent misrepresentations, he knew them to be false, that they were incomplete and they were made with the purpose of inducing Friedler and Passen to invest in the real estate properties.  Those false representations were made for the purpose of defrauding Friedler and Passen.

223.    Bart also made false representations to Friedler and Passen, and induced Friedler and Passen into taking actions such as providing documents relating to the acquisition of the Investment Properties knowing that they were false, incomplete or were for fraudulent purposes.

224.    Miller fraudulently induced Friedler into investing in the Investment Entities knowing that Cole intended to defraud Friedler.  Miller also conspired to fraudulently induce

Passen into entering into the Miller Assignment whereby Miller received an artificially inflated price for his interest in the Investment Entities.

225.   Coldwell Banker Commercial and Coldwell Banker Title also made false representations to Friedler and Passen in the form of documents prepared in relation to the closings for the Investment Properties that did not correctly set forth the terms of the real estate deals.  At the time these documents were created, Coldwell Baker Commercial and Coldwell Banker Title knew, or should have known, that they were false, or they were made with such reckless disregard for the truth that knowledge of their falsity can be inferred.

226.   Plaintiffs relied on these false representations and their reliance was justified. Cole was an agent for Coldwell Banker Commercial and Coldwell Banker Title and at all times relevant hereto Coldwell Banker Commercial and Coldwell Banker Title knew or should have known that Cole was engaged in such fraudulent conduct.

227.   DLS Exchange fraudulently induced Riderwood to enter into the DLS Exchange Note when it knew or should have known that it was in return for fraudulently raising the purchase price.  Because the purchase price was artificially inflated, Riderwood received no consideration in return for entering into the DLS Exchange Note.  Riderwood is entitled to have the DLS Exchange note rescinded.  Riderwod promptly exercised its right to rescind the DLS Exchange Note upon learning of this fraud.

228.   Cole fraudulently paid Corridor, a broker associated with Riderwood Holdings the sellers of Riderwood, a commission for the sale of Riderwood when Corridor had provided no services.  Plaintiffs are entitled to a judgment against Corridor in the amount of that wrongful payment.

229.   In return for fraudulently raising the purchase price of 200 Washington Avenue, Cole induced Friedler to enter into a promissory note with some of the sellers of 200 Washington Avenue, H-200, 200 L.P. and VI-4, in the amount of $1,000,000 (hereafter, the "200 Washington Note").   The 200 Washington Note has been satisfied.  Because the 200 Washington Note was

procured by fraud, Plaintiffs are entitled to a judgment against H-200, 200 L.P. and VI-4 in the amount of all payments and consideration that was paid for the 200 Washington Note.

230.   The aforesaid misrepresentations and omissions were material, were made for the purpose of defrauding Plaintiffs, and were justifiably relied upon by Plaintiffs. The fraudulent representations made by Defendants were made with the intention of having Plaintiffs act and rely upon them.

231.   Had Plaintiffs known such representations to be false, Plaintiffs would not have entered into the investments set up by Cole; would not have entered into the DLS Exchange Note; and would not have entered into the 200 Washington Note.

232.   Cole, Bart, Coldwell Banker Commercial, Coldwell Banker Title, DLS Exchange, H-200, 200 L.P., VI-4 and Miller acted with actual malice toward Plaintiffs when they fraudulently induced Plaintiffs to acquire the Investment Properties, enter into the DLS Exchange Note and enter into the 200 Washington Avenue Note knowing that the aforementioned representations were false, with the intention to deceive Plaintiffs and with the knowledge and intention that Plaintiffs would rely on their misrepresentations.

233.   Furthermore, Cole's fraudulent misrepresentations induced Friedler and Cole to enter into the Old Pad Assignment. As a result of those misrepresentations, and Cole's separate breach of his representations and warranties in the Old Pad Assignment, Friedler and Passen are entitled to rescind the Old Pad Assignment.

234.   As a direct result of their reliance on the above-described fraudulent misrepresentation, Plaintiffs have incurred substantial damages.

WHEREFORE, Plaintiffs demand judgment against Cole, Bart, Coldwell Banker Commercial, Coldwell Banker Title, DLS Exchange, Corridor, H-200, 200 L.P., VI-4 and Miller in compensatory damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, punitive damages of $25,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just.

## COUNT FIVE

### NEGLIGENT MISREPRESENTATION
(Cole, Coldwell Banker Commercial, Coldwell Banker Title)

235.    Plaintiffs incorporate here all of the preceding paragraphs.

236.    At all times, Coldwell Banker Title was acting as the settlement and escrow agent with a specific duty to act on behalf of the purchasers of the Investment Properties.

237.    As such, Coldwell Banker Title was in contractual privity with the Plaintiffs or, alternatively, an intimate nexus existed between them such that contractual privity can be implied.

238.    Coldwell Banker Title had an obligation, among other things, to collect and prepare documents that fully and accurately reflected the transactions it was handling.

239.    Coldwell Banker Commercial, as a real estate broker had a duty to the purchasers to fully and accurately communicate all aspects of the transaction, including a duty to disclose all commissions or other payments that were being made by Coldwell Banker Title.

240.    Coldwell Banker Title and Coldwell Banker Commercial breached these duties by, among other things, negligently failing to fully disclose the payments to B&N or that B&N was an entity controlled by Cole or negligently preparing closing documents that contained material misrepresentations.

241.    The failure to disclose, or concealment of the payments to B&N, and other information regarding B&N, were negligent misrepresentations.

242.    These negligent misrepresentations were false and were repeated on numerous occasions by Coldwell Banker Commercial and Coldwell Banker Title.  It was the intention of Coldwell Banker Commercial and Coldwell Banker Title to have Plaintiffs rely and/or act on these negligent assertions because Coldwell Banker Commercial and Coldwell Banker Title wanted Plaintiffs to purchase properties from which Coldwell Banker Commercial and Coldwell Banker Title would receive a portion of the commissions.

243.    Coldwell Banker Commercial and Coldwell Banker Title knew that Plaintiffs probably would rely on the closing documents, which, if erroneous, or incomplete, would cause loss or injury.

244.    Plaintiffs relied on these false representations and their reliance was justified.

245.    Had Plaintiffs know such representations to be false, Plaintiffs would not have entered into the investments set up by Cole. As a direct and proximate result of their reliance on the above-described negligent misrepresentation, Plaintiffs have incurred substantial damages.

WHEREFORE, Plaintiffs demand judgment against Cole, Coldwell Banker Commercial and Coldwell Banker Title in compensatory damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just.

## COUNT SIX
## NEGLIGENCE
(Coldwell Banker Title)

246.    Plaintiffs incorporate here all of the preceding paragraphs.

247.    At all times, Coldwell Banker Title was acting as the settlement and escrow agent with a specific duty to act on behalf of the purchasers of the Investment Properties.

248.    As such, Coldwell Banker Title was in contractual privity with the Plaintiffs or, alternatively, an intimate nexus existed between them such that contractual privity can be implied.

249.    Coldwell Banker Title had an obligation, among other things, to act independently from Cole and from Coldwell Banker Commercial in every settlement and/or closing; to act in the best interest of Plaintiffs; to act as a fiduciary to Plaintiffs, from whom Coldwell Banker Title received funds; to collect and prepare documents that fully and accurately reflected the transactions it was handling; and to otherwise act as a reasonably prudent title company and escrow agent.

250.    Coldwell Banker Title breached these duties by, among other things, negligently failing to act independently from Cole and from Coldwell Banker Commercial, failing to act in the best interest of Plaintiffs; failing to act as a fiduciary to Plaintiffs; failing to fully disclose the payments to B&N or that B&N was an entity controlled by Cole or negligently preparing closing documents that contained material misrepresentations; and were otherwise negligent.

251.    As a direct and proximate result of Coldwell Banker Title's breaches, Plaintiffs incurred substantial damages. These damages were foreseeable.

WHEREFORE, Plaintiffs demand judgment against Coldwell Banker Title in damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just

## COUNT SEVEN

## NEGLIGENCE/ RESPONDEAT SUPERIOR
### (Coldwell Banker Commercial)

252.    Plaintiffs incorporate here all of the preceding paragraphs.

253.    The acts by Cole, and the resulting losses and damages suffered by Plaintiffs, as set forth in this Complaint generally and in Count I, II and III specifically, were conducted in his capacity as an real estate agent, and/or as an agent, servant, representative and/or employee, of Coldwell Banker Commercial.

254.    Cole's acts and omissions, as described above, caused injuries and damages to Plaintiffs.

255.    These acts and omissions by Cole were committed and/or performed within the scope of Cole's employment and/or relationship with Coldwell Banker Commercial, in that Cole performed real estate functions and transactions while working as a real estate agent for Coldwell Banker Commercial, using Coldwell Banker Commercial's real estate transaction forms, at or from Coldwell Banker Commercial's place of business, in furtherance of Coldwell Banker Commercial's interests.

256. Coldwell Banker Commercial, as Cole's employer, principal, and/or master is responsible for all of the acts committed by Cole within the scope of his employment and relationship with Coldwell Banker Commercial, including Cole's duty to advise, inform and guide Plaintiffs in real estate matters, properly and with reasonable care; to be truthful and accurate in assessing property values or relating property values; to properly advise them regarding all issues related to the real estate transactions; to properly advise them of certain necessary disclosures; and to otherwise act within the standard of care of a person in Cole's position.

WHEREFORE, Plaintiffs demand judgment against Coldwell Banker Commercial and Coldwell Banker Title in damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just

## COUNT EIGHT
## NEGLIGENT HIRING AND SUPERVISION
(Coldwell Banker Commercial)

257. Plaintiffs incorporate here all of the preceding paragraphs.

258. An employment relationship existed between Coldwell Banker Commercial and Cole, because Coldwell Banker Commercial hired Cole as a real estate agent.

259. Cole's acts and omissions, as described above, caused injuries and damages to Plaintiffs.

260. Coldwell Banker Commercial knew or should have known had it performed any background check or exercised reasonable care that Cole was capable of inflicting harm on potential customers of Coldwell Banker Commercial. Among other things, Cole's history included a multi-million dollar judgment against him for intentional torts. On information and

belief, Coldwell Banker Commercial did not perform a thorough background check when it engaged Cole to work at Coldwell Banker Commercial.

261.   Coldwell Banker Commercial failed to use proper care in selecting, supervising and retaining Cole.  Coldwell Banker Commercial had a duty to supervise Cole's activities as its employee and agent.   Coldwell Banker Commercial knew that Cole was investing in the Investment Properties and knew Cole was being paid unusually large amounts of money. Coldwell Banker Commercial breached its obligation to ensure that Cole was dealing fairly and honestly with investors, and fully disclosing all aspects of the relationship.

262.   Coldwell Banker Commercial negligently retained Cole despite the fact that it knew or, had it exercised reasonable care, should have known that Cole had a multi-million dollar judgment for intentional torts against him and that in early 2001, Cole was sued for fraud and conspiracy arising from a similar real estate transaction.   Moreover, Coldwell Banker Commercial negligently retained Cole after it knew or should have known following the 22 West Padonia Road transaction that, his actions were improper.

263.   As a direct and proximate result of Coldwell Banker Commercial's negligent hiring, retention, and supervision of Cole, Plaintiffs suffered foreseeable injuries and damages.

WHEREFORE, Plaintiffs demand judgment against Coldwell Banker Commercial in damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just.

## COUNT NINE

### CIVIL CONSPIRACY
(Cole, B&N, Padonia Management, Bart, Coldwell Banker Commercial,
Coldwell Banker Title, Miller, DLS Exchange, Corridor, H-200, 200 L.P., VI-4)

264.   Plaintiffs incorporate here all of the preceding paragraphs.

265.    Each of the named Defendants entered into an agreement or understanding to enter into a confederation, the purpose of which was to defraud Friedler and Passen.

266.    This confederation performed unlawful or tortious acts to further the conspiracy or used unlawful or tortious means to accomplish an act not in itself illegal.

267.    As a result of Defendants' civil conspiracy, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Cole, B&N, Padonia Management, Bart, Coldwell Banker Commercial, Coldwell Banker Title, Miller, DLS Exchange, Corridor, H-200, 200 L.P. and VI-4 in compensatory damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just.

## COUNT TEN

## BREACH OF FIDUCIARY DUTIES
(Cole)

268.    Plaintiffs incorporate here all of the preceding paragraphs.

269.    As the manager of the properties and a member of the Investment Entities, Cole had a duty of loyalty and a duty of care to the other members.

270.    Included in this duty was an obligation to properly disclose and account to the other members for all property that was due to the Investment Entities.

271.    As a result of the above-described fraudulent conduct, Cole breached those fiduciary duties.

272.    Plaintiffs have suffered damages as a result of Cole's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Cole, in compensatory damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just.

## COUNT ELEVEN

## BREACH OF ASSIGNMENT AGREEMENT
### (Cole)

273.    Lighthouse Point incorporates here all of the preceding paragraphs.

274.    Under the terms of the Cole Assignment, among other things, Cole represented and warranted that he provided to Passen true and complete copies of the balance sheets of the Investment Entities and related statements of income and that the retained earnings and changes in financial position fairly represented the financial condition and results of operations of the Investment Properties in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods presented, except for liabilities reflected on the Investment Entities' balance sheets.

275.    Also under the Cole Assignment, Cole represented and warranted that except for transactions disclosed to and approved by all of the owners of interests in the Investment Entities, since its formation, none of the Investment Entities had:

a.    Borrowed any amount or incurred or become subject to any material liabilities, except current liabilities incurred in the ordinary course of business and liabilities under contracts entered into in the ordinary course of business;

b.    Discharged or satisfied any material lien or encumbrance or paid any material obligation or liability other than current liabilities paid in the ordinary course of business;

c.    Paid or committed to any bonuses or similar payments or payments to related entities or persons, except in the ordinary course of business;

d.    Made any loans or advances to, guarantees for the benefit of, or any investments in, any person or entity.

276.    Cole further represented and warranted in the Cole Assignment the following:

a.    All tax returns and related information required to be filed by or on behalf of the Investment Entities prior to the date of the Cole Assignment had been prepared and filed in accordance with applicable law, and any assessments have been paid in full.

b.    There are no sums due from any of the Investment Entities to Cole or to any entity in which Cole is a member, party or shareholder (including without limitation Padonia Management);

c.    There are no loans due from the Investment Entities except for the loans listed on Exhibit B to the Cole Assignment (which was a list of loans previously disclosed to Passen, Friedler, and Lighthouse Point);

d.    Neither Cole nor any of the Investment Entities have made any material misstatements of fact or omitted to state material facts necessary to make complete, accurate, and not misleading every representation, warranty, schedule, and agreement set forth, described or referred to in the Cole Assignment.

277.    Cole acknowledged in the Cole Assignment that Lighthouse Point was relying upon the foregoing representations, warranties and covenants of Cole in entering into the Cole Assignment and such reliance was a material consideration by Lighthouse Point for payment of the purchase price for the Cole interests agreed to be paid by Lighthouse Point.

278.    As part of the Cole Assignment and in verbal representations repeatedly made by Cole to Passen and others, Cole also agreed to immediately deliver to Passen all documentation in Cole's possession or reasonable control concerning the Investment Entities and the Investment Properties.

279.    Under the terms of the Cole Assignment, Lighthouse Point has a period of three years to review the documents and other matters concerning the Cole interest in the Investment Entities and the Investment Properties.  Lighthouse Point also reserved all other rights available at law or in equity, in the event that Cole breached the warranties and representations of the Cole Assignment.

280.    Based on his fraudulent conduct, Cole has breached his warranties and representations included in the Cole Assignment.

281.    As a result of Cole's breach of the Cole Assignment, Lighthouse Point has suffered damages.

WHEREFORE, Lighthouse Point demands judgment against Cole in compensatory damages in an amount to be proven at trial, but which is presently calculated to be at least $7,000,000, attorneys' fees, interest, costs and such further relief as the Court may deem just.

## COUNT TWELVE

### ACCOUNTING
### (Padonia Management)

282.    Friedler incorporates here all of the preceding paragraphs.

283.    Padonia Management is under a legal and equitable duty to account to its members.

284.    Friedler is a member of Padonia Management.

285.    Padonia Management occupied a position of trust and confidence with Friedler.

286.    As described above, Padonia Management was used as a vehicle for numerous fraudulent and unauthorized transactions involving Friedler's investments in the Investment Properties. On information and belief, Padonia Management was also used to defraud Friedler in another investment, Roland View Green, orchestrated by Cole.

287.    Padonia Management is in sole possession of the account books, records and documents necessary to determine the financial affairs of Padonia Management's business. Padonia Management refuses to allow Friedler to inspect those documents.

288.    As a member of Padonia Management, Friedler is entitled to a full accounting of Padonia Management's books and records from March 2000 to the present. There is no adequate remedy at law and/or the remedy is difficult, inadequate or incomplete.

**WHEREFORE,** Friedler demands that Padonia Management be ordered by a decree of this Court to fully and completely account for all sums relating to its business from March 2000 to the present, and Friedler be awarded such other and further relief as justice and its cause requires.

Respectfully submitted,


Gerard P. Martin
Kevin J. Pascale
Christine T. Pham
Rosenberg | Martin | Funk | Greenberg, LLP
25 S. Charles Street, Suite 2115
Baltimore, Maryland  21201
(410) 727-6600


and


Arnold M. Weiner
Weiner & Weltchek
2330 West Joppa Road, Suite 300
Lutherville, Maryland 21093
(410) 769-8080

Attorneys for Plaintiffs

198055.07

51